RENDERED: JULY 12, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1197-MR

JEREMY STEVEN DELK                         APPELLANT


                 APPEAL FROM JESSAMINE FAMILY COURT
v.                 HONORABLE JEFFREY C. MOSS, JUDGE
                    ACTION NO. 19-CI-00334


CYNTHIA MAE DELK                         APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, EASTON, AND GOODWINE, JUDGES.

EASTON, JUDGE: The Appellant ("Jeremy") seeks review of the Jessamine Family Court's Findings of Fact, Conclusions of Law, and Decree of Dissolution of Marriage dividing marital property in a divorce action between himself and the Appellee ("Cindy"). Finding no error, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Jeremy and Cindy were married in 2010. Prior to the marriage, Cindy worked as a dental assistant. She continued to work until the birth of the parties'

first child.  Jeremy is a venture capitalist who invests in several businesses. Jeremy started Delk Enterprises, Inc. ("Delk Enterprises") in 2001 as a holding company for various interests in businesses and real estate.

Delk Enterprises owned a 47.5% interest in Tailor Made Compounding ("TMC") and a 26% interest in Medivet.  As of 2019, these two entities comprised the majority of the value of Delk Enterprises.  In late 2018, the United States Food and Drug Administration ("FDA") sent an initial letter advising of its concerns with illegal activity by TMC and Medivet.  Specifically, the FDA was investigating the sale of illegal performance enhancing drugs for horses.  The investigation was completed in 2020.  Medivet closed as of March 2020.  Jeremy entered a guilty plea on behalf of TMC to the illegal production and distribution of compounded substances.  A monetary fine of approximately $1.8 million was imposed for the illegal acts.  TMC was sold in October 2020.

Cindy filed the Petition for Dissolution of Marriage in May 2019, after learning of Jeremy's extramarital affair.  Of course, the law does not permit consideration of such moral issues in the division of marital property.  The family court must simply classify marital assets, value them, and then equitably divide them.  In order for the family court to equitably (not necessarily equally) divide the marital property in this case, it became necessary to value Delk Enterprises and to determine as of what date Delk Enterprises would be valued.

Both parties hired certified public accountants as experts to value Delk Enterprises. Cindy hired Jim Roller ("Roller"), and Jeremy hired Calvin D. Cranfill ("Cranfill"). The parties requested the family court to set a valuation date for Delk Enterprises. The family court conducted a hearing in June 2020 on the requested issue of determining a valuation date for Delk Enterprises. At this hearing, both experts testified.

Roller testified the year-end date of December 31, 2019, should be the valuation date as it matches the numbers utilized in filing taxes with the IRS and would include any year-end adjustments. He explained that, if a mid-year date is selected, more work would be required to see prior year-end adjustments and to speculate on future adjustments that would impact the business. Roller also noted that there is no specific guidance to valuing businesses during a pandemic such as COVID-19. Roller indicated that he could not consider the FDA investigation in valuation if the valuation date was December 31, 2019.

Cranfill testified that year-end dates are usually preferred, but for the court to make an equitable division of property, the valuation date would need to be as close to the decree of dissolution as possible. To Cranfill, the best date to use would be June 30, 2020, if the parties could agree on what constituted good data. Cranfill was concerned that one of Delk Enterprise's businesses, TMC, suffered a

decrease in sales due to regulatory consequences that occurred after December 31, 2019.

The family court ruled the valuation date would be December 31, 2019, as each expert would have confirmable figures submitted to the IRS. The family court noted the potential benefit of June 30, 2020, date as it was closer to the decree of dissolution date – however, the court explained this date would only work if the parties agreed on what constituted good data. As the family court aptly observed, Jeremy and Cindy could not agree on anything about these matters.

The family court entered its Order Regarding Valuation Date in July 2020 setting forth the court's specific findings and reasoning as to why it chose the evaluation date of December 31, 2019. Jeremy filed a Motion to Alter, Amend, or Vacate the family court's Order Regarding Valuation Date. Cindy filed a response. The family court did not set the Motion for a hearing and ruled based on the submitted pleadings. The family court denied Jeremy's Motion.

The final hearing took place on February 7, February 8, and April 5, 2022. The hearing consisted not only of issues relating to individual business and other asset valuations but also claims of dissipation of marital assets, assignment of marital debts and assets, child support, and claims to fees. Custody issues are not raised in this appeal. The focus of the appeal is on marital property and its division.

-4-

Cindy testified she and Jeremy agreed for her to become a stay-at-home mom after the birth of their first child in 2013. After the divorce, Cindy plans to work as a spa owner/operator when Jeremy has the children 50% of the time. Cindy said she and Jeremy enjoyed a very comfortable lifestyle, including private flights and a vacation home.

Cindy talked about the marital home located at 160 Hambrick Drive, Nicholasville, Kentucky, where she continues to live with the children. Jeremy is currently residing in the house he built during the pendency of the divorce, located at 419 Keene Manor Circle, Nicholasville, Kentucky. Both properties were appraised by Ben Campbell on Jeremy's behalf. The parties stipulated the value of 160 Hambrick Drive at $1.2 million. 419 Keene Manor Circle was appraised at $1.75 million.

Jeremy testified he earned a salary of $20,000 per month at a rate of $5,000 per week through Delk Enterprises. Jeremy introduced a summary of his taxable income from 2013-2020. Jeremy earned between $100,000 and $600,000 per year before 2019. Jeremy's income significantly increased when the parties separated and began to live apart. Jeremy had a million-dollar income in 2019.

Both Jeremy and Cindy spoke of their vacation home in the British Virgin Islands known as the "Glass House." It was purchased in 2016. Jeremy said he purchased the land for the Glass House for $295,000 with the purchase

price loaned to the Jeremy S. Delk Irrevocable Trust ("Irrevocable Trust") by Delk Enterprises. Jeremy explained that the Irrevocable Trust was established by his mother, and that he is the Trustee. The Irrevocable Trust borrowed $1.8 million from V.P. Bank to build the Glass House on the property. There was a current balance owed of $1.6 million. Appraiser Simon Watson testified the Glass House property is valued at $2.2 million.

The Glass House is currently a vacation rental property, with Delk Enterprises acting as the booking agent. The parties have received considerable income from renting the Glass House. Cindy was once mentioned on the website for the Glass House, but any reference to her has since been removed. Jeremy received all of the rental income for the Glass House through Delk Enterprises, and this rental income appeared on the parties' last joint marital income tax returns.

There was disagreement between Jeremy and Cindy as to the nature of the Irrevocable Trust. Cindy testified she was informed that the purpose of the Trust was to protect the Glass House property for their children. Jeremy testified the parties met with legal counsel who advised Cindy she was waiving her marital interest rights in the property by consenting to it being placed in trust.

Jeremy acquired the property located at 500 Beauford Place, Nicholasville, through GHD Properties, LLC ("GHD"). Jeremy created GHD after December 31, 2019. This property was sold on December 6, 2021, for $4.3

million. After paying real estate agent fees, closing costs, and outstanding debt, GHD received net proceeds of $993,297.47.

Much of the rest of the hearing about property was a battle of experts. Roller testified at length. He also submitted a 114-page valuation engagement as defined by the Statement of Standards for Valuation Services ("SVSS") of the American Institute of Certified Public Accountants ("AICPA"). He performed a valuation of twelve businesses in which Delk Enterprises had an ownership interest. Seven of those businesses have a negative value, which were listed as having a value of $0 in the total value of Delk Enterprises. Roller's report stated the following regarding the entities with value listed at $0: "The entity is a limited liability company, and we are not aware of any legal obligation that would require Delk Enterprises, LLC, to contribute any capital to the LLC or pay any obligations of the LLC." Roller estimated the value of Delk Enterprises to be $6,690,000 as of December 31, 2019. Roller valued TMC at $7,249,680. When Delk Enterprises' 47.5% interest is applied to that number, the value of the TMC interest within Delk Enterprises was $3,443,598.

Cranfill also testified. He submitted a report of calculated value on November 12, 2020. The report contained a cover letter stating Cranfill performed a calculation agreement as defined by the SVSS of the AICPA. Cranfill's report included the negative values (not set at $0) of seven businesses owned by Delk

-7-

Enterprises. This resulted in a total reduction in value of Delk Enterprises of $695,324. Cranfill calculated Delk Enterprises' fair market value to be $5,038,000 as of December 31, 2019. Cranfill valued TMC at $3,547,000.

On July 19, 2022, the family court entered its written Findings of Fact, Conclusions of Law, and Decree of Dissolution of Marriage. The family court found the value of Delk Enterprises to be $6,690,000 as of December 31, 2019. The family court reiterated there were no other practical means of obtaining a valuation in this matter other than to set an absolute date for both experts to consider. The family court found Roller's conclusion of value report to be more complete. The court awarded Delk Enterprises and its assets, as well as all associated debt to Jeremy.

As to the parties' residential homes, Cindy was awarded the home at 160 Hambrick Drive (appraised at $1.2 million with no debt). Jeremy was awarded the home at 419 Keene Manor Circle (appraised at $1.75 million but with debt). The family court determined that Jeremy would be solely responsible for the debt on 419 Keene Manor Circle.

The family court determined the Glass House to be part of the marital estate as the property was purchased during the marriage with funds from a marital business. The family court found the trust documents relating to the Irrevocable Trust insufficient to find Cindy waived her marital interest in the property when

-8-

the property was allegedly placed in trust by Jeremy for Jeremy's sole benefit. The Glass House was appraised at $2.2 million. As Cindy did not have the legal status to own property in the British Virgin Islands, the family court assigned the Glass House to Jeremy, who would be responsible for the outstanding mortgage ($1.6 million) to V.P. Bank. The family court concluded an equalization payment mentioned later in the decree would include Cindy's equity in the Glass House.

The family court then found the proceeds of the sale of 500 Beauford Place to be marital property. The proceeds were in the amount of $993,297.47. The court directed Cindy's one-half share of the proceeds (*viz.* $496,648.73) be distributed to her immediately.

The family court denied Jeremy's request to divide the marital estate 60/40 in his favor. The family court stated it would divide the marital estate equally.

The family court attached a spreadsheet detailing total marital assets of $14,588,534.31. The division of the marital assets and debts described in the spreadsheet revealed Jeremy receiving marital assets of $12,544,441.65 and Cindy receiving marital assets of $2,044,092.67. To equalize the marital estate, the court directed Jeremy to pay $5,250,174.49 to Cindy within 90 days of the entry of the decree. And until Jeremy paid those funds, Jeremy was also directed to continue to

pay to Cindy a monthly payment of $15,000 each month, which would not reduce the overall amount of the $5,250,174.49 owed to Cindy.

The family court did not find permanent maintenance appropriate based upon its division of the assets. The family court found Cindy had been awarded sufficient marital property to support herself. The family court awarded child support in the amount of $2,500 until Cindy could start earning her own income in the spa business she was planning.

Both parties filed Motions to Alter, Amend, or Vacate the family court's decree of dissolution. Cindy's Motion requested mostly clerical changes. Jeremy's Motion asked the court for the following: (1) to reconsider the valuation date of Delk Enterprises; (2) to amend the final spreadsheet to indicate the VP Bank mortgage of the Glass House to be a liability, and not an asset; (3) to remove the proceeds of the sale of 500 Beauford Place as this asset was considered part of Delk Enterprises by both experts' reports with a value of $1,116,900.16, listed as "Loans to Trust"; (4) to reconsider including the 419 Keene Manor Circle property with all debt as an asset to Jeremy; (5) to reconsider its ultimate calculations and reduce the value of Delk Enterprises by $1.8 million based upon the fine imposed for criminal activity paid after December 31, 2019; and (6) to reconsider its decision on the value of a property located in Bardstown, which was included as an

asset of Delk Enterprises. The parties argued their respective Motions before the court on August 30, 2022.

The family court entered its Order Following Motions to Alter, Amend, or Vacate on September 22, 2022. This Order altered the final spreadsheet indicating the VP Bank mortgage of the Glass House was a liability, and not an asset. The court granted Jeremy's request to alter its prior order by reducing the value of Delk Enterprises based on the sale of the Bardstown property. Consequently, the court reduced the value of Delk Enterprises by $364,000, from $6,690,000 to $6,326,000. Based upon this reduction of value of Delk Enterprises, the court attached an amended spreadsheet showing an amended equalization payment by Jeremy to Cindy of $3,650,034.49 with respect to Delk Enterprises.

Jeremy filed this appeal. Additional facts will be set forth below as necessary.

## ANALYSIS

In his appeal, Jeremy argues the following: (1) the family court erred in setting the valuation date for Delk Enterprises as December 31, 2019; (2) the family court failed to account for substantial changes to the assets and debts of Delk Enterprises that occurred prior to the final hearing; (3) the family court awarded certain assets twice, both as an asset of Delk Enterprises and again as an asset of the marital estate; (4) the family court failed to include debt owed on his

-11-

home located at 419 Keene Manor Circle in the overall division of the marital estate; (5) the family court erred and even exceeded its subject matter jurisdiction[1] by placing the assets of The Dynasty Trust and the Irrevocable Trust into the marital estate; and (6) the family court erred in ordering a monthly payment of $15,000 from Jeremy to Cindy without a statutory basis.

A court's division of parties' property in a divorce action is governed by KRS[2] 403.190.  This statute requires a three-step process:  (1) the family court first characterizes each item of property as marital or non-marital; (2) the family court then assigns each party's non-marital property to that party; and (3) finally, the family court equitably divides the marital property between the parties.  *Travis v. Travis*, 59 S.W.3d 904, 908-09 (Ky. 2001).  Under KRS 403.190(3), "[a]ll property acquired by either spouse after the marriage and before a decree of legal separation is presumed to be marital property[.]"

Some property will often consist of both non-marital and marital components.  *Travis*, *supra*, at 909.  When this occurs, the family court must determine the parties' separate non-marital and marital shares or interests in the property from the evidence before the court.  *Id.*  Kentucky courts have typically

[1] Jeremy may have intended to argue a lack of personal jurisdiction over the trust entities.  There is no question that a family court in the process of a divorce has subject matter jurisdiction to find, value, and divide marital property regardless of how it is held.

[2] Kentucky Revised Statutes.

applied the "source of funds" rule – which means that the character of the property, whether marital, non-marital, or both, is determined by the source of the funds used to acquire the property. *Smith v. Smith*, *infra*, at 5.

## I. VALUATION DATE

Jeremy argues the family court erred in setting the valuation date for Delk Enterprises on December 31, 2019, instead of his requested date of June 30, 2020. "[T]he trial court's judgment and valuations in an action for divorce will not be disturbed on appeal unless it was clearly contrary to the weight of evidence." *Clark v. Clark*, 782 S.W.2d 56, 58 (Ky. App. 1990). The duty of a reviewing court is to examine the methods utilized by the trial court to see if it clearly erred in valuing assets. *Id.* at 58-59. "The task of the appellate court is to determine whether the trial court's approach reasonably approximated the net value of the partnership interest." *Id.* at 59.

The family court agreed with Roller that December 31, 2019, was the best valuation date as it would reflect the same numbers used to file the parties' taxes and would include any year-end adjustments frequently made by businesses. The court believed that a mid-year date would require more work to determine prior year-end adjustments and would require speculation on future adjustments that would impact the business' value. The court noted the potential benefits of having the valuation date closer to the divorce decree, but it stated such a date

would require an agreement between the parties as to what constitutes good data. In its Order Regarding Valuation Date, the court stated: "The parties in this action have shown the Court that they cannot agree on anything relating to these businesses. For that reason, the Court has no faith the parties would be able to agree on what is good data." Further, the court properly considered that there was no other viable date to use because Jeremy continuously moved marital business funds and continued to create new entities.

In *Gaskill v. Robbins*, 361 S.W.3d 337 (Ky. App. 2012), a wife ("Gaskill") appealed from the family court's judgment regarding the valuation and distribution of her oral surgery practice in a divorce proceeding. The family court had decided to use a valuation date of December 2003, instead of December 2004. Gaskill argued the family court abused its discretion by failing to adopt the business valuation performed closest to the date of the decree. *Id.* at 339.

This Court disagreed with Gaskill, stating: "The trial court must consider a variety of factors to properly value a business, including which calculations best represent the business's value." *Id.* at 340. The Court added there is no bright-line method used to evaluate property. *Id.* (citing *Clark*, *supra*, at 59). The family court in *Gaskill* considered the evaluations of two different experts and simply considered one more credible. The Court held the family

court's decision to value the oral surgery practice in December 2003 to be well-reasoned and based on ample evidence.

Similarly, we cannot say the family court erred when it determined a valuation date of December 31, 2019. The Order Regarding Valuation Date gave a well-reasoned explanation why the court chose that date. The parties could not agree on anything, so the court determined a year-end date would provide the least amount of disagreement between them.

Jeremy repeatedly moved marital funds, created new entities, and purchased assets. The family court stated in its decree of dissolution: "The Court found there was simply no other viable date for the Court to reliably utilize, as Jeremy continually moved funds and opened and closed new endeavors, and the accountant for the business and the parties was unable to complete tax returns on the entities in a timely fashion." Jeremy's acts forced the family court to draw a line in the sand.

The court also heard the testimonies of Roller and Cranfill and gave Roller's testimony and report more weight. What credibility to give to a witness is for the family court to decide. The family court did not abuse its discretion in setting the valuation date for Delk Enterprises.

Jeremy then insists that the family court's staying with the date of December 31, 2019, even with the delay between that decision and the final

decision ignored significant issues that negatively impacted Delk Enterprises' value prior to the final hearing in 2022. Jeremy brought this matter up again before the final hearing and in his Motion to Alter, Amend, or Vacate the court's decree of dissolution.

Jeremy contends the family court ignored the impact COVID-19 restrictions and regulations had on his businesses. Roller acknowledged during the June 9, 2020, hearing that COVID-19 caused "unprecedented times." He testified there is no specific guidance to valuing businesses during a pandemic. As the pandemic was not known or knowable on December 31, 2019, Roller said he would not consider the pandemic as a material event that would affect the valuation date. Since December 31, 2019, was the only date the family court felt it could designate as the valuation date, it was proper to exclude discussion of COVID-19 restrictions that were unknowable at the time. Significantly, Jeremy did not present evidence of any specific financial losses attributable to such restrictions.

The other issue Jeremy asserts the family court ignored in staying with the chosen valuation date was the ability of the experts to consider the FDA's investigation into Medivet and TMC (which, as previously mentioned, comprised the majority of the value of Delk Enterprise in 2019). The FDA first notified Medivet and TMC of its investigation in 2018. Medivet closed before the June 9,

-16-

2020, hearing. Thus, Jeremy argues, it was error for the family court to include in the value of Delk Enterprises assets which did not exist at the final hearing.

In support, Jeremy cites *Thielmeier v. Thielmeier*, 664 S.W.3d 563 (Ky. 2022). In *Thielmeier*, the Kentucky Supreme Court held it was error for the family court to date a 401(k) account on the date of separation instead of the date of marital dissolution. *Id.* at 573. The family court was held to have erred for not addressing the factors mentioned in KRS 403.190(1)(a)-(d) as to why it chose a different date than dissolution. *Id.* at 576.

*Thielmeier* is distinguishable from the current case. The family court in *Thielmeier* gave little explanation for its valuation. In the current case, there was evidence that Jeremy had started multiple new entities in the period from December 31, 2019, to the final hearing. There were also numerous discovery disputes about Jeremy's holdings. The family court held December 31, 2019, was the only valid date to use due to Jeremy's continuous dealings and shifting of marital funds. Because of his post-separation activities involving Delk Enterprises, Jeremy did not and perhaps could not show that the value of Delk Enterprises was actually significantly different by the time of the final hearing. If the value did decrease, Jeremy contributed to this decrease because of his business activities and could have even planned such a decrease to lessen Cindy's marital interest.

-17-

Also, Jeremy never actually asked for Delk Enterprises to be valued as of the date of the dissolution decree. Jeremy asked for June 30, 2020, knowing that things were about to happen with the entities held by Delk Enterprises. The family court could have chosen that date or another reasonable option. The family court here gave a thorough analysis as to why it chose the valuation date, and the family court's actions are compatible with the rulings in *Gaskill* and *Thielmeier*, when considered in the context of this case.

Since December 31, 2019, was the validly chosen date, the family court deemed the consequences of federal penalties unknowable as of that date. The court stated: "Jeremy was aware of an investigation and possible penalties on December 31, 2019. No one was aware, on December 31, 2019, of the actual penalties that would be imposed or the transactions and maneuvers that Jeremy would undertake after the Federal government completed its investigation."

As previously mentioned, TMC and Medivet were found guilty of selling illegal performance enhancing drugs for horses. Medivet ceased operations in March 2020, and TMC was sold in October 2020. As Delk Enterprises had ownership interests in both entities, it was fined $1.8 million as a partial disgorgement of certain income earned between October 2018 and April 2020.

We do not believe the family court erred. The full extent of the FDA investigation was unknowable as of December 31, 2019. Further, the payment of a

$1.8 million fine to disgorge prior income does not necessarily result in a *pro rata* reduction in the actual *value* of the entity paying the fine when other activities by Jeremy serve to alter the holdings of that entity prior to the final hearing. To the extent this occurred, Jeremy's other business activities could just have easily increased or decreased the overall value of Delk Enterprises after 2019.

## II. AWARDING ASSETS TWICE

Jeremy argues the family court abused its discretion in awarding assets twice, both as an asset of Delk Enterprises and again as an asset of the marital estate. The division of marital property is within the sound discretion of the family court and will not be disturbed unless the family court abuses its discretion. *McGregor v. McGregor*, 334 S.W.3d 113, 119 (Ky. App. 2011).

Jeremy states the December 31, 2019, valuation of Delk Enterprises included in its assets: 1) loans to a trust of $1,116,900; and 2) artwork. Jeremy asserts that, when the family court accepted Roller's valuation of Delk Enterprises, it incorporated a December 31, 2019, value for these two assets in Delk Enterprises, which were awarded to Jeremy in its overall division of the marital estate. Jeremy asserts the family court then included these two assets separately in the marital estate, valuing them as a line item in its spreadsheet with a second assigned value apart from Delk Enterprises.

The first asset Jeremy claims was awarded twice relates to his objection to the classification of the sale proceeds of 500 Beauford Place as marital property. Roller's valuation included a loan to the Jeremy S. Delk Family Dynasty Trust ("Dynasty Trust") from Delk Enterprises in the amount of $1,116,000. Jeremy claims the Dynasty Trust then loaned $1.1 million of the proceeds it loaned from Delk Enterprises to GHD, which used the funds for the specific purpose of purchasing 500 Beauford Place.

Jeremy claims the family court should have considered the loan to GHD as a debt owed by GHD to the Dynasty Trust. In its Order Following Motions to Amend, Alter, or Vacate, the family court found "that insufficient proof was submitted to connect this property to the line items of the expert's reports." There was no evidence 500 Beauford Place was placed into a trust. That property was purchased by GHD Properties – which was not valued with Delk Enterprises and was formed separately by Jeremy to purchase property with marital funds. Thus, the loans to a trust mentioned in the ledger for Delk Enterprises most likely does not match the loan Jeremy is alleging. The court reasonably concluded that Jeremy did not prove the proceeds of 500 Beauford Place were counted twice.

As for the artwork, Cindy presented evidence at trial of insurance documentation verifying two pieces of art insured under the parties' homeowner insurance. One of these artworks was a painting by Andy Warhol insured for

$19,000. The other artwork was insured for $11,000. Cindy also introduced evidence of Jeremy owning multiple pieces of artwork not named on the homeowner's insurance policy that were valued at well over $56,000. The decree of dissolution lists a painting labeled "Andy Warhol" worth $14,000 and awarded to Jeremy.

There was no indication at the final hearing that any of this artwork was doubly accounted for by the family court. From the record, it appears there are two separate paintings by Andy Warhol with different values. At least, Jeremy has failed to clearly show any double accounting entry as to any specific item. Roller and Cranfill would have been aware of the artwork line-items and could have gone over this information with their respective clients prior to the final hearing. Jeremy also could have had his CPA testify as to the alleged "double dipping" by the circuit court, but he did not. The family court did not count the same painting twice when dividing the marital estate.

### III. DEBT ON 419 KEENE CIRCLE MANOR

Jeremy's next argument is that the family court erred in failing to include debt owed on his home in the overall division of the marital estate. "As with issues pertaining to the assignment of marital property, issues pertaining to the assignment of debts incurred during the marriage are reviewed under an abuse

of discretion standard." *Neidlinger v. Neidlinger*, 52 S.W.3d 513, 523 (Ky. 2001), *overruled for other reasons by Smith v. McGill*, 556 S.W.3d 552 (Ky. 2018).

The family court awarded Jeremy the home located at 419 Keene Manor Circle at the stipulated value but refused to reduce the equity of the home by the outstanding debt secured by that property. In April 2020, Jeremy signed a construction loan contract of $1,150,281 with a $10,000 deposit to build 419 Keene Manor Circle. Jeremy later secured a mortgage to Citadel to complete construction overages and to pay off the construction loan. Jeremy claims the Citadel mortgage paid off the construction note in full, and that the current mortgage balance to Citadel was $1,189,070.58 as of February 1, 2022.

Evidence and testimony at the final hearing showed that Jeremy paid the initial deposit of $10,000 and then made additional payments in the amounts of $609,591.94; $250,000; and $290,690.06. Evidence also showed Jeremy completely paid for the construction of 419 Keene Manor Circle, and then he made the decision to take a line of credit with the property as collateral on October 27, 2021, in the amount of $1,007,316.50. But for this decision, his home would have been completely paid off by October 2021.

The family court found that Jeremy took available funds from Delk Enterprises to fund the building of the home entirely and that he subsequently chose to encumber the property with debt to purchase other real property and/or

-22-

business interests. The family court found Jeremy unilaterally decided to re-encumber the property eighteen months after the initial agreement with the builder, and he then used the resulting credit to fund the purchases of properties and interests he would retain. Therefore, the family court declined to award an offset for any current debt on 419 Keene Manor Circle.

There are various factors used to assign debts incurred during the marriage: which party will reap the benefit, *Van Bussum v. Van Bussum*, 728 S.W.2d 538, 539 (Ky. App. 1987); whether the debt was incurred to purchase assets designated as marital property, *Daniels v. Daniels*, 726 S.W.2d 705, 706-07 (Ky. App 1986) *overruled for other grounds by Neidlinger*, *supra*; whether the debt was necessary to provide for the maintenance and support of the family, *Gipson v. Gipson*, 702 S.W.2d 54, 55 (Ky. App. 1985); and the economic circumstances of the parties bearing on their respective abilities to assume the indebtedness. *Neidlinger*, *supra*, at 523.

We agree with the family court's decision to not award an offset. Jeremy does not refute that the loans taken out on 419 Keene Manor Circle were for his primary benefit. Jeremy confirms in his brief that said property was used as collateral for a line of credit for Tru Diagnostics, yet another entity created by Jeremy. The family court found the loans taken out on the property to be for

Jeremy's primary benefit. The family court did not abuse its discretion when it assigned the debt on 419 Keene Manor Circle entirely to Jeremy.

## IV. TRUSTS AND THE MARITAL ESTATE

Jeremy argues the family court erred in placing the assets of two separate third-party Trusts (The Dynasty Trust and the Irrevocable Trust) into the marital estate. "The question of whether an item is marital or nonmarital is reviewed under a two-tiered scrutiny in which the factual findings made by the court are reviewed under the clearly erroneous standard and the ultimate legal conclusion denominating the item as marital or nonmarital is reviewed de novo." *Smith v. Smith*, 235 S.W.3d 1, 6 (Ky. App. 2006), *as modified* (Feb. 10, 2006). The division of marital property is within the sound discretion of the family court and will not be disturbed unless the family court abuses its discretion. *McGregor*, *supra*, at 119.

Jeremy argues the family court's consideration of the two Trusts in the marital estate disregarded the trusts' separate entities. Jeremy asserts that, since Cindy did not join the Trusts as parties to the action, the Trusts failed to receive notice of the hearing or the right to be represented as required by *Ensor v. Ensor*, 431 S.W.3d 462 (Ky. App. 2013).

As previously mentioned, Jeremy claims the Dynasty Trust loaned $1.1 million to GHD properties for the purchase of 500 Beauford Place. Jeremy

asserts the notes receivable from the Dynasty Trust, owed to Delk Enterprises, were included as assets of the marital estates. Jeremy also asserts that the assets of the Dynasty Trust (*e.g.*, the proceeds from the sale of 500 Beauford Place) were included as a separate marital asset. Jeremy argues those proceeds had already been disbursed by GHD Properties to the Dynasty Trust to satisfy its debt, and the family court refused to recognize the debt owed to the Trust.

There was no evidence at the final hearing that the property purchased by GHD went into a trust. Jeremy signed the contract for the sale of 500 Beauford Place as the representative for GHD, a business entity started by Jeremy after December 31, 2019. Jeremy made vague references to eventually obtaining documentation of 500 Beauford Place being held in trust, but he did not do so. The court correctly found the proceeds of 500 Beauford Place to be marital in nature.

Jeremy also asserts the family court erred by placing the Glass House, ostensibly an asset of the Irrevocable Trust, into the marital estate. As previously mentioned, Jeremy claims legal counsel advised Cindy she would be waiving her marital interest rights in the property by consenting to it being place in trust. The family court found that the Glass House was purchased during the marriage with funds from a marital business, making the asset a marital asset suitable for division. The court stated:

> The trust documents submitted by Jeremy were
> insufficient for the Court to find that Cindy had waived

all marital interest in the property when the property was allegedly placed into trust by Jeremy for Jeremy's benefit. Jeremy's argument is further undercut by the testimony that the rental income from the property goes into Delk Enterprises, Inc. account and is claimed annually by the parties on their personal return.

We agree with the family court that Jeremy failed to prove Cindy waived her marital interest in the Glass House. At the final hearing, Jeremy introduced into evidence a document entitled "Jeremy S. Delk Trust" that was executed in 2016 by Jeremy and his mother, indicating the Trust was started with $2,500. However, this does not show Cindy waived her marital interest. Jeremy did not have the legal counsel who ostensibly advised Cindy of her waiver testify on his behalf. The family court correctly noted the Glass House was purchased with marital funds from the family business, Delk Enterprises. The court further noted the rental income earned from the Glass House goes to Delk Enterprises and was claimed annually by the parties on tax filings. The court correctly classified the Glass House as marital property.

## V. $15,000 MONTHLY PAYMENT TO CINDY

Finally, Jeremy argues the family court erred in ordering a monthly payment of $15,000 from Jeremy to Cindy without a statutory basis. In August of 2019, the Court entered an Agreed Order on Temporary Matters[3] to maintain the

---

[3] The Order states: "The parties agree to maintain the current status quo as it relates to maintaining all insurance payments, bills associated with the marital residence and care of the

status quo. Contrary to the plain wording of this Agreed Order, Jeremy unilaterally placed a monthly limit on the American Express card without any agreement with or notice to Cindy or her counsel.

The law does not exalt form over substance. The Agreed Order provided temporary funding in the form of temporary maintenance and to some extent child support. KRS 403.160 allows the family court to enter a temporary maintenance award to support a spouse while a dissolution action is pending. *Atkisson v. Atkisson*, 298 S.W.3d 858, 864 (Ky. App. 2009). "The purpose of temporary maintenance is to preserve the status quo between the spouses while the dissolution proceeding is pending." *Horvath v. Horvath*, 250 S.W.3d 316, 318 (Ky. 2008).

Temporary continuance of this monthly payment served more than one purpose. It served to correct any loss Cindy sustained because of Jeremy's unilateral decision to limit this source of funding. It made sure Cindy had sufficient resources until Jeremy complied with the court's final decision on allocation and thus eventual transfer of marital property, and it was part of equalizing the division of property if there were delays in the transfers of property.

---

children, cell phone accounts and credit card payments for Cynthia in the same manner as these had been paid prior to the separation of the parties. There shall be no change to Cynthia's American Express card or its limit as this is the credit card she uses for many of her daily expenses with the children, entertainment and for their home. Maintenance shall not be determined until such time as all marital income and bill payments have been exchanged."

When we examine the provision about this payment in context of the overall final decision, we see its proper purpose. In its decree of dissolution, the family court attached a spreadsheet detailing total net marital assets of $14,588,534.31. The division of the marital assets and debts described in the spreadsheet revealed Jeremy receiving net marital assets of $12,544,441.65 and Cindy receiving net marital assets of $2,044,092.67. In order to equalize the marital estate, the court directed Jeremy to pay $5,250,174.49 to Cindy within 90 days of the entry of the decree. The family court stated:

> The Court has divided assets as described above with an intent to give Jeremy flexibility in determining how to equalize the marital estate to Cindy and in an effort to cause only a minimal amount of disruption of Jeremy's business plans. Jeremy has shown that he is able to obtain liquidity as he deems appropriate as evidenced by the multiple purchases of assets during this action. Until these funds have been provided to Cindy to the satisfaction of the Court, Jeremy shall pay Cindy $15,000 each month, which shall not reduce the amount of the $5,250,174.49 owed to Cindy. This shall not be viewed as an opportunity for Jeremy to convert the payment obligation to Cindy for a monthly payment.

The family court correctly decided that permanent maintenance was not appropriate based upon the court's division of assets. But until Cindy received the assets, maintaining the status quo was proper. The family court did not err or abuse its discretion in ordering the monthly payment to continue.

**CONCLUSION**

The family court did not err in its classification, valuation, or division of the marital estate. The Jessamine Family Court is AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Valerie S. Kershaw
Suzanne M. Baumgardner
Lexington, Kentucky

BRIEF FOR APPELLEE:

Lisa J. Oeltgen
Lexington, Kentucky